FIRST STATE BANK OF DUNN CENTER, NORTH DA-KOTA, a Corporation, Respondent, v. THE NORTHERN TRUST COMPANY and CHARLES J. HEEN, Appellants.

(191 N. W. 470.)

**Principal and surety — evidence held insufficient to establish embezzlement by bank cashier in action by bank on fidelity bond.**

In an action to recover on a fidelity bond where the plaintiff bank seeks to recover by reason of the embezzlement of its cashier in making large loans to a customer with whom he was jointly associated in farming operations, it is *held*, for reasons stated in the opinion, that the evidence is insufficient to establish any embezzlement.

Opinion filed July 7, 1922. Rehearing denied December 14, 1922.

Principal and Surety, 32 Cyc. p. 138 n. 54 New.

Action in District Court, Dunn County, *Berry, J.*

Defendant has appealed from the judgment and an order denying judgment non obstante or, in the alternative, for judgment and new trial.

Judgment reversed and action dismissed.

*James P. Cain,* for appellant, Heen, and *Pierce, Tenneson, Cupler & Stambaugh,* for appellant, The Northern Trust Co.

Fraud will never be presumed, but must be clearly proved. It cannot be based on mere suspicion or conjecture. Redpath Bros. v. Lawrence, 48 Mo. App. 427; Braddock v. Louchheim, 87 Fed. 287.

---

Note.—For authorities discussing the question as to what amounts to embezzlement or larceny within fidelity bond, see note in 16 A.L.R. 1493, where it appears that an employee who becomes indebted to his employer by using funds of .the employer for his personal use with no intent to defraud, is not guilty of embezzlement within the meaning of a fidelity bond; 14 R. C. L. 1267, et seq.; 3 R. C. L. Supps. 374, et seq.; 4 R. C. L. Supp. 955.

Fraud must be proven with some degree of certainty, and cannot be inferred or presumed from ambiguous evidence. Denoyer v. First Nat. Acci. Co. (Wis.) 130 N. W. 475.

It cannot be based on conjecture. Priest v. Wade, 87 Mo. 16; Maples v. Burns, 72 Mo. App. 411.

The evidence to establish fraud must be unequivocal and convincing. The evidence must be "clear, precise, and indubitable." Maxwell Land Grant Case, 121 U. S. 325, 30 L. ed. 949; American Nat. Bank v. Supplee, 115 Fed. 657, and other cases cited in note to 33 L.R.A. (N.S.) at page 833 to 829.

Fraud must be proved "by clear and satisfactory evidence, and the more serious the nature of the fraud charged, the more rigidly should that rule be applied." Maldaner v. Smith, (Wis.) 78 N. W. 140; Neacy v. Milwaukee County (Wis.) 128 N. W. 1063.

Fraud should not be found when the facts and circumstances proven are consistent with honesty of purpose. Smith v. Branch Bank, 21 Ala. 125, and other cases cited in note to 33 L.R.A. (N.S.) at page 840.

"The courts presume that a man acts honestly in his dealing with his fellowmen, and to establish fraud it is necessary that the evidence be strong enough to overcome this presumption." Note to 33 L.R.A. (N.S.) page 841, and cases cited.

"The evidence of fraud must be such as generates a belief, not merely raises a suspicion. Lewen v. Thurber, 62 Ga. 25; Waddingham v. Lokger, 44 Mo. 132, 100 Am. Dec. 260.

"The law presumes every man honest until the contrary is shown. We do not think the evidence establishes that the discrepancy arose from the fraud or dishonesty of Smith (the bank employee) amounting to larceny or embezzlement." United States Fidelity Co. v. Batesville Bank (Ark.) 112 S. E. 957.

"Astute as courts should be in the detection of fraud, they are not justified in finding it on the grounds which show no more than its possible existence. When the acts of parties admit of a reasonable interpretation in favor of honesty and fair dealing, they should receive it." Murehide v. Smith, 35 N. J. Eq. 303, page 309. See also McCarthy v. Scanlan, 176 Pa. 262, 35 Atl. 189.

"It is not enough to create a suspicion of wrong, *nor should a jury be permitted to guess at the truth.* Church, C. J., in Jaeger v. Kelley,

52 N. Y. 274, 276. See also Gauge v. Burns (Neb.) 111 N. W. 791; Jacobs v. Van Syckle, C. C. A. 127 Fed. 62, 67.

The matters covered by the warranties being material and having increased the risk, it is wholly immaterial whether they were made fraudulently and with intent to deceive, although it is apparent that the warranty as to Mr. Heen's indebtedness was knowingly false. Van Woert v. Modern Woodmen of America (N. D.) 151 N. W. 224.

"One applying for fidelity insurance for his employees cannot withhold from the insurer information that the employee is in the habit of overdrawing his account and that it is overdrawn at the time the application is made." National Surety Co. v. Globe Grain & Mill. Co. (C. C. A.) 256 Fed. 601, 4 Am. L. Rep. 552, and note at 558.

A breach of warranty to the effect that the employee is not indebted to the employer is material and prevents the bond from becoming effective. Fidelity & Casualty Co. v. Bank of Timmonsville, 71 C. C. A. 299, 139 Fed. 101; Bank of Hardingsburg & T. Co. v. American Bonding Co. (Ky.) 156 S. W. 394; Willoughby v. Fidelity & D. Co. (Okla.) 85 Pac. 713, 7 L.R.A.(N.S.) 548, 8 Ann. Cas. 603.

In Willoughby v. Fidelity & C. Co. supra, it is said: "It must be assumed that any substantial deviation from the truth in such answers is material to the risk and renders the policy void." And in the same case, quoting from American Credit Indemnity Co. v. Carrollton Furniture Mfg. Co. (C. C. A.) 95 Fed. 111, it is said: "When there is a distinct agreement that an application for insurance is a part of the contract, and the statements in the application are expressly declared to be warranties, they are to be treated as such, and not merely as representations, and must be strictly true, or the policy will not take effect."

The breaches of warranty obviously increasing the risk, it is immaterial whether there was any intention to deceive the trust company. The question of increase of risk is one of law for the court, and not for the jury, in this case. Van Woert v. Modern Woodmen of America, (N. D.) 151 N. W. 224; March v. Metropolitan Life, 186 Pa. 629, 65 Am. St. Rep. 887, 40 Atl. 1100; Fidelity Mut. Life Asso. v. Miller, 92 Fed. 63, 34 C. C. A. 211; 14 R. C. L. p. 1034; Johnson v. National Life, (Minn.) 144 N. W. 218, Ann. Cas. 1915A, 456.

And the question whether notice was given, as required by the bond,

is a question of law where the facts are undisputed, as in the case at bar.

"The general rule is that the question of reasonable time is one of fact, and must be submitted to the jury with proper instructions; but when the facts are undisputed, and only one reasonable conclusion can be drawn therefrom, it is the duty of the trial judge to instruct the jury accordingly." Hormel v. American Bonding Co. (Minn.) 128 N. W. 12, at page 14.

In the following cases, it was held that the notice was not given "immediately" or within a reasonable time in view of all the circumstances. Burnham v. Royal Ins. Co. 75 Mo. App. 394. (Seventeen days under fire policy); Lake Geneva Ice Co. v. Selvage, 73 N. Y. Supp. 193 (sixty days under fire policy); Foster v. F. & C. Co. (Wis.) 75 N. W. 69 (twenty-nine days under accident policy); Ermon Trout v. Girard F. & M. Ins. Co. (Minn.) 65 N. W. 635, 30 L.R.A. 346, 56 Am. St. Rep. 481; Underwood v. London G. & A. Co. (Wis.) 75 N. W. 996; National Paper Box Co. v. Aetna L. Ins. Co. (Mo.) 156 S. W. 740; Emory v. Glenn Ins. Co. (Del.) 76 Atl. 230; Erenson v. Frankfort Ins. Co. (Cal. App.) 99 Pac. 537; Barclay v. London G. & A. Co. (Colo.) 105 Pac. 865; Oakland Motor Car Co. v. American Fidelity Co. (Mich.) 155 N. W. 729; Los Angeles Athletic Club v. U. S. F. & G. Co. (Cal.) 183 Pac. 174 (sixty days after becoming aware of defalcation on fidelity bond).

"Ordinarily a trial judge is not obliged to prepare forms of verdict, but may do so if a party is not prejudiced thereby; *but if he does so, the forms should be complete as the case requires,* and where the issues are different between plaintiff and several defendants, it is error for the court to decline a form of verdict, whereby the jury might find for plaintiff against one defendant and in favor of the other defendants."

*T. F. Murtha* and *Alf. O. Nelson,* for respondent.

The proposition raised by the appellant as to the construction of the bond, is wholly immaterial. The facts clearly establish embezzlement. 25 C. J. 1093, note 45; City T. S. D. & L. Co. v. Lee (Ill.) 68 N. E. 485; Rankin v. Guaranty Co. (Ind.) 99 N. E. 314; 20 C. J. 426 to 438.

Continuous series of acts. 20 C. J. 429.

An embezzlement may consist of a continuous series of conversions,

or the conversion of money or property received at different times from different sources.

"Settlement by giving a note for money embezzled does not effect the criminal liability of the guilty person." Guenther v. State (Wis.) 118 N. W. 640.

"In a prosecution for larceny by a bailee of money left with defendant to invest in first mortgages, it is no defense that the owner of the money attempted to collect the money or obtain a surety therefor." State v. Chapin (Or.) 144 Pac. 1187.

## Statement.

BRONSON, J. This is an action on a fidelity bond. The jury returned a verdict in plaintiff's favor for $10,000, the amount of the bond. Defendants have appealed from the judgment and from an order denying judgment non obstante, or, in the alternative, a new trial.

The complaint alleges a breach of the bond in the years 1919, 1920, and up to January 14th, 1921, through the embezzlement of plaintiff's cashier, the principal in the bond.

The record is voluminous. Numerous exhibits were introduced. A week was consumed in taking evidence. The record has been carefully examined. Only the facts, necessary for the consideration of the decision, will be stated. They are as follows: From May, 1914, until about June 1st, 1921, the defendant Heen was cashier of the plaintiff bank. During that time the defendants were obligated to the plaintiff upon a fidelity bond. This bond provides that the employee shall, in the position of cashier, make good to the employer within thirty days, any loss sustained by the employer through larceny or embezzlement committed by the employee. One Schriver was a farmer engaged in operating around 2,000 acres of land near Dunn Center. He did business with the plaintiff bank and other banks in Dunn Center and Werner. In May, 1918, from the plaintiff bank, he made a loan for $100. Schriver testified that he and Heen, in that year, were jointly interested in a flax crop upon 40 acres of land rented by Schriver. The agreement, not in writing, was that Heen should let Schriver have money and Schriver was to give Heen part of the crop; that Heen would loan him some money from the bank. In 1919 they were again jointly inter-

ested; they sowed wheat on this same ground. Schriver borrowed the money from the bank through Heen. The record discloses that on May 26th, 1919, Schriver borrowed $200 from the bank.

Schriver further testified that, in September or October, 1919, he and Heen bought some hogs together; the deal involved some $600 or $700; he issued a check on the bank; it went through; later, he gave a note therefor; Heen was entitled to receive half of the profits and agreed to furnish the money; they bought about thirty sows and pigs; Schriver contracted for buttermilk with a creamery and received it; Heen knew about this arrangement; finally he sold some of the hogs at a sale, killed some of them, and shipped some of them to St. Paul; he has two full blooded sows left; during the big snow storm in 1920 he lost 100 head of hogs and pigs and other property; upon the hogs that he bought, the bank had a first lien.

On October 6th, 1919, Schriver gave to Heen a bill of sale of one-half interest in the hogs. Then, as he testified, Heen did not know he was giving a bill of sale of his interest in the hogs. On August 25th, 1921, Heen transferred his interest, received from Schriver, to the bank. Heen denies any partnership arrangement concerning the hogs. He explains that this bill of sale was taken to protect the bank. The record does not disclose that he received any moneys or profit in this hog venture excepting hog meat brought by Schriver for Heen's personal consumption. The record further discloses that from September, 1919, to January 1st, 1920, the indebtedness of Schriver at the bank through loans increased to $2,700. Among the loans constituting this increased indebtedness are four notes aggregating over $1,500, which, from the record, apparently, concerned the hogs.

Schriver further testified: In the fall of 1919 he advised Heen that he was going to sell out; he had insufficient money to continue farming; he told Heen that he would furnish all machinery, horses, time, and everything, if Heen would furnish the money and pay half of the expenses excepting groceries, Heen agreed to go in with him. Later, in April or May, 1920, a contract dated January 12th, 1920, was made between Schriver and Heen. It transfers to Heen half of all grain raised during the season of 1920 upon some 2,000 acres of land; it requires Heen to pay for half of the seed grain and half of the hired expenses such as gasolene, oil, sharpening plow lays, and feed for spring

work. It requires Schriver to perform all the work and deliver half of the grain at elevators at Dunn Center and Werner free of any charge or expense. This contract was witnessed by Schulberg, director of the bank, and Hintz, the assistant cashier. It was recorded in the office of the register of deeds by Heen, on May 8th, 1920.

Schriver further testified: In 1919 he threshed around 2,000 bushels of wheat, receiving from one bushel to two bushels per acre; he did not cut his flax, oats, or speltz; there was nothing left after the thresher was paid. In 1920, pursuant to this contract, he put in about 1,000 or 1,100 acres; he got the money to carry on his farming operations from the plaintiff bank; every nickel he received from the bank was used in his farming operations. During the fall and the early part of 1920 Schriver shipped in corn, oats, speltz, and hay. Money was secured from the bank to pay bills of lading therefor. Schriver figured on selling some of the grain and making a profit thereupon. He did sell some grain. All moneys received in such sales were paid into the bank. Schriver received no money from such transactions. The proceeds were credited to his account. However, concerning corn sold, he received a profit in the form of five or six loads which he hauled to the farm and used for feed. Also he exchanged some seed speltz for seed wheat.

Throughout 1920, Schriver issued checks from time to time. These were paid by the bank. Overdrafts occurred. From time to time notes were given by Schriver to take up these overdrafts. On March 29th, 1920, Schriver gave a note for $2,400 secured by chattel mortgage on fifty-one head of cattle and increase. Schriver advised Heen that he could not give a first mortgage. Heen said it would be satisfactory as security just the same. This note for $2,400, apparently, he credited on Schriver's account March 29th, 1920. At that time his account showed an overdraft of $1,100. The abstract of chattel mortgages against Schriver's cattle at that time showed a chattel mortgage on three head of heifers, another on five head of cattle, another for two cows, another for one bull, and another to the plaintiff for five head of cattle. Schriver testified that in the fall of 1919 he had fifty-one head of cattle. He sold two and lost thirteen in the spring of 1920.

In 1920, upon Schriver's crops, extensive hail insurance, both state and old line, was secured. The old line insurance was approximately $5,000. The state, $4,200. Some hail insurance was issued jointly to

Heen and Schriver with a mortgage clause in favor of the bank. Some application blanks for such insurance were signed by Heen and Schriver. To some extent Heen and Schriver both signed notes for the premium. Through these farming operations in 1920 the indebtedness of Schriver at the bank increased until it was, on October 1st, 1920, $14,269.05. On May 15th, 1920, Heen borrowed, personally, from the bank, $1,000, which amount was credited to Schriver's account. On July 19th, he borrowed from the bank $490.45 which he paid for seed flax. Besides these amounts he was otherwise indebted to the bank for $450, a loan extending back to 1917. All of these loans were made by Heen excepting the sum of $1,980 made in various loans to Schriver by the assistant cashier. From the record it apparently appears that the total loans made to Schriver up to October 1st, 1920, excluding renewals, amounted approximately to $17,200. In 1920 Schriver's crops suffered severe hail losses through four hail storms. In August and September, 1920, $4,388.80 was received through the insurance against hail losses. It was credited to a deposit account known in the bank as the Heen & Schriver account. In August, 1920, an insurance note, interest included, for $916.15 was paid out of this account. Also $760.52 out of this account was paid to Heen and a like amount credited to Schriver's account. Later the bank officials, without objection of Heen, on October 23d, 1920, charged to this account several notes of Schriver's and expense items concerning the farming operations aggregating $1,950.50. Later Heen received about $1,500 out of the warrant of $2,368.45 payable by the state to Heen, Schriver, and the Merchants State Bank, dated January 3d, 1921. With such money he paid one of his notes and interest. In the fall of 1920, pursuant to Schriver's testimony, the crops amounted to about 2,000 bushels in which he and Heen were interested. They were placed in elevators at Werner. They became subjected to threshing and other liens. No settlement was made with the bank.

W. A. McClure testified: He has been president and director of the bank since its organization in 1913. For about eighteen months or two years prior to August, 1919, he was actively engaged in the bank. Heen generally made all loans. Once in a while McClure would make a small loan. In January, 1920, the board of directors considered the Schriver loans. Mr. Heen assured them that the loans were well secured and

were all right. Likewise, in July, 1920, the Schriver loans were considered and the board of directors were assured by Heen that the loans were safe and would be paid. He described the crop· and the security. The first intimation he had about the contract between Heen and Schriver was about December 20th, 1920. Then he wrote the trust company on January 14th, 1921. He brought the matter to the attention of the state's attorney in May, 1921. He always found Heen to be reliable, honest, and trustworthy. He never found any false entries on the books by which any transactions were concealed or covered up. As far as he could discover the records and books in the bank were kept correctly and truly show all transactions that Heen had as cashier. He was present at several director's meetings during September and October when Schriver's notes were considered. They met in October, 1920. Schriver's notes were considered and Heen was criticized severely for letting Schriver borrow the money. The directors had an examining committee. Heen was intrusted with the management of the bank and was authorized to make loans and to use his judgment in making them. In examining paper they went through the note pouch, examined the notes, talked about the security and checked them with the book. He was present at the meeting of the directors in January, 1921. Then he knew that the trust company denied any liability on the bond and that Heen denied that he was guilty of any embezzlement. Heen never disclosed to him that he was interested in farming operations with Schriver in 1918, 1919, or 1920.

F. E. McClure testified: He has been a stockholder since the organization of the bank. He was a director from January, 1921, until June, 1921. He came to the bank in September, 1920, to assist in collections generally. He was there assisting the cashier, after consulting with the board of directors and the president of the bank. While there he and Heen went to see Schriver about his obligations; they saw him in Werner in October, 1920; Schriver stated that it was impossible for him to pay any amount then; that the grain in the elevator could not be sold without Heen's consent, nor could Heen sell it without his consent; that it was stored in the name of Heen & Schriver. At the bank in December, 1920, he saw the contract between Heen and Schriver. Heen produced it without hesitation.

Bailey testified: He has been a director since 1917. He was present

at a meeting of the directors on October 16th, 1920, when a chattel abstract of the Schriver property was ordered. He did not know about the contract between Heen and Schriver until about the last of December, 1920.

Schulberg testified: He was a director from February, 1917, until May, 1921. He learned about the contract between December 1st and 15th, 1920. The minutes of the board of directors show that in January and July, 1920, the examining committee certified that the assets of the bank were not being carried in excess of actual value. Minutes of October 16th, 1920, authorized an abstract of the Schriver property to be obtained and to proceed to collect indebtedness due the bank. On December 1st, 1920, a special meeting of the directors was held but no consideration of the Schriver loan was made. The minutes of the meeting January 25th, 1921, show that Heen and Hintz were continued respectively as cashier and assistant cashier, to receive for their services the same wages paid them the past year. Also, that the examining committee made a thorough examination of the bank and found the assets not to be carried in excess of their actual value.

Baker testified: He was a director from February, 1917, until May, 1921. He was a member of the auditing committee. At the meeting in January, 1920, Heen told him the Schriver loans were good loans and well secured. He first met Schriver in October, 1920. He was present at a meeting of the board of directors on October 16th, 1920. He was at the bank assisting in collections from that time until about March 1st, 1921, excepting election time when he was away about three weeks. He first learned of this contract between Heen and Schriver some time between December 1st and 15th, 1920. He had some talk with Heen about the Heen & Schriver account in October, 1920. He talked with Heen about charging off some memorandum notes signed by Heen and Schriver against this Heen and Schriver account. He and Mr. Heen, during the winter of 1920–21 endeavored to make a settlement with Schriver concerning this indebtedness. He was willing to make a deal with Schriver and allow him to have seed wheat to plant for the crop of 1921, to secure the indebtedness of the bank by a mortgage on that crop, and to make settlement in that way but not to advance any money to Schriver for expenses.

Thoreson testified: He is the state's attorney; he was attorney for

the bank. Some time before the auction sale of Schriver he saw the contract between Heen and Schriver in the bank, when Mr. Baker, McClure, and Hintz were present. He told Frank McClure that there was such a contract. He advised the bank to charge against this Heen & Schriver account the Schriver notes.

On January 14th, 1921, McClure, the president, sent to the trust company a telegram and letter to the effect that Heen had misappropriated funds belonging to the bank, in that he had made loans to Schriver in large amounts the proceeds of which went to his benefit. A meeting was held at Dickinson attended by the president of the trust company, the president of the bank, and Heen. The loans made by Heen were considered. Heen stated there was no criminal intent; that the loans would work out. The president of the trust company advised that no criminal intent appeared and there was no liability under the bond; that the directors should get together and work the matter out.

Heen continued to work at the bank. He and the directors attempted to adjust the Schriver loans. The 1920 crop was still unliquidated. Schriver desired to secure seed for the farming season of 1921 and also assurance of financial aid. Liens upon the 1920 crop needed adjustment. The directors of the bank were willing that an adjustment be made with Schriver but were unwilling that any more moneys be furnished him for the season of 1921. Finally, in March, 1921, a written contract signed by Schriver and the bank, through Heen as cashier, was made. It provides that the bank shall pay out of the 1920 crop certain liens thereupon and shall apply the balance upon Schriver's account with the bank; that the bank shall loan to Schriver, during the season of 1921, not exceeding $950 for purposes of paying expenses incidental to seeding the 1921 crops upon some 1,600 acres of land.

Accordingly, all of the outstanding loans were renewed and evidenced by new notes signed by Schriver totaling $14,269.05. Additional security was taken upon the 1921 crop and all of the former notes and chattel security therefor were retained as collateral to such new notes. These notes were registered, or entered, in April and May, 1921. In April, 1921, another new note for $950 was made by Schriver and his account credited with such amount. The directors deny any authority on the part of Heen to make such agreement with Schriver. In May, 1921, one Davis, an examiner for the Bank of North Dakota, appeared

at the bank. He made investigations concerning the Schriver loans. Prior to June 1st, 1921, he arranged to purchase a majority of the stock in the bank. On May 17th, 1921, Heen filed a written resignation effective June 1st, 1921, since which time he has not been connected with the bank. On June 1st Davis became, and since has been, cashier of the bank. The directors held a meeting in May, 1921. Davis and the directors claim that they did not know about this written agreement with Schriver. On May 14th, 1921, the trust company was advised by registered letter of the president, McClure, to the effect that Heen had misappropriated funds belonging to the bank; that the bank expected the company to make good any losses sustained. The letter charges that Heen had been guilty of embezzlement as cashier of the bank and that the company was liable as surety upon this bond. Proof of liability was furnished, wherein it was claimed that Heen had advanced large sums of money to Schriver for purposes of financing farming operations of Heen and Schriver and that they were individually responsible for the amount of such loans, all without the consent of the board of directors. Attached thereto is an affidavit by Heen to the effect that, under the contract made, Schriver was permitted to draw checks·upon the bank in payment of his expenses in conducting farming operations; that Heen admits himself liable for half of the money so expended, pursuant to the contract; that the funds used were moneys of the bank without authorization of the board of directors. Davis. after he became cashier and after he learned about this contract, took new security from Schriver. On June 2d, he loaned him $405.69 representing the balance then due the bank on various checks that were carried as cash items. On June 4th he loaned him $360 for hail in· surance. On July 1st he loaned him $50. On July 18th, 1921, he loaned him $360 on account of hail insurance. On July 23d, 1921, he loaned him $750 upon some binders that it was necessary for Schriver to purchase. The bank. took a mortgage proportionately upon the binders and upon one fourth of Schriver's crop. Again in 1921 Schriver suffered hail losses. All of the loans made by Davis to Schriver have been paid excepting the note for $750. When the loans were made to Schriver by Davis there was sufficient insurance moneys already in sight to reduce Schriver's indebtedness down to a point lower than it was in September, 1920. Since September, 1920, the aggregate of

new loans made to Schriver, including the $950, amounts to $2,875.69. Prior to the trial the bank had collected for hail insurance of 1921 approximately $1,770. It had available but not collected an assignment for hail insurance amounting to about $2,400. This would wipe out the new indebtedness since September, 1920, and leave a net credit to be applied on old indebtedness of around $1,200.

At the time of the trial Schriver was threshing the 1921 crop. The bank had a man checking the operations. There was testimony to the effect that the bank would receive something out of this 1921 crop. There is also testimony in the record to the effect that the chattel mortgages taken by Heen as security for the loans made to Schriver were inadequate to cover the amount of the advances and in many instances were upon property, or some property, previously mortgaged to other parties. No criminal proceedings were ever instituted against Heen.

## Decision.

The defendants have specified a volume of errors. Principally they contend that the evidence fails to establish embezzlement; that the acts of the bank directors and other officials show knowledge and ratification.

In justification of the judgment, the plaintiff maintains that the loans to Schriver were really loans to Heen; that these loans were poorly secured and practically worthless; that he took security appearing on its face to be a first loan when he knew it, in fact, not to be; that he represented these loans to be good when he knew they were not; that he permitted hogs and cattle covered by mortgages to be shipped and the proceeds dissipated; that he used some hay and feed in his enterprise with Schriver; that he tried to get away with insurance moneys and did get away with over $2,200; that he acted under a contract which no business man could make in good faith.

The transactions are much involved. It is difficult to state the facts without extending the recital into a volume. The gist of plaintiff's action is embezzlement through misappropriation. The action is not one for negligence or violation of instructions. The embezzlement must be established by facts showing wrongful misappropriation at the time of commission and not by the consequent results. If Schriver had prospered and the bank had collected all loans and suffered no loss,

embezzlement nevertheless would have existed if fraudulent and wrongful acts were proved at the time of commission. Embezzlement, again, is not to be determined by the extent or certainty of the pecuniary loss. Dominion Trust Co. v. National Surety Co. 137 C. C. A. 342, 221 Fed. 618, Ann. Cas. 1917C, 447.

Heen. may have been negligent. He may have violated instructions express or implied. He may have shown a lack of good faith. He may have displayed an overweening optimism and extremely poor business judgment. Nevertheless, the question is,—was he, upon the record, an embezzler?

If he was, then Schriver, who performed the transactions and received the bank's money, perhaps might be equally chargeable with guilt. Wrongful commissions of Schriver are necessary to establish wrongful commissions by Heen. As an accessory, his guilt is the same as that of the principal. Comp. Laws 1913, § 10,705.

If Heen was an embezzler, then the directors and other officials of the bank continued Heen in employment with full authority to act and continue his wrongful commissions, after full knowledge of his relations with Schriver.

There is no evidence shown and there is no claim made that Heen wrongfully secreted the bank's property. It is not asserted that Heen made any wrongful misappropriation of bank funds by loans to himself. It is not asserted nor shown that Heen in any respect falsified any of the records or books in the bank. All the transactions had between Heen and Schriver were a matter of record, entered either in the bank's books or in the public record.

The charge of embezzlement depends solely upon the transactions that Heen had with Schriver in farming operations. To uphold this charge, the plaintiff relies upon misappropriation with fraudulent intent concerning loans apparently good on their face, but, in fact, poorly secured and practically worthless; upon permitting Schriver to sell mortgaged property and to borrow money and dissipate the proceeds; upon permitting Schriver to use hay, feed, and grain in a joint farming enterprise; in receiving insurance moneys for his own personal use and in making a contract not in good faith.

It is evident that this criminal charge cannot be upheld so far as the association of Heen and Schriver is concerned in 1918 concerning the

flax crop. The same comment may be made concerning the wheat crop of 1919 upon the flax land.

Concerning the hog venture, Schriver testifies that Heen was jointly interested. Heen denies any connection. In any event this discrepancy in the testimony is deemed immaterial. There is no showing in the evidence of misappropriation of any bank funds or hogs by Heen. He never received any profit thereupon. The bank had a first chattel mortgage upon the same. It received whatever proceeds accrued in the disposition of the hogs. The venture apparently was unsuccessful. Schriver sustained a large loss in a snow storm in 1920. The bank received the interest that Schriver transferred to Heen in 1920 by bill of sale.

The transactions had with Schriver in 1920 in farming operations are more involved. It appears clear that the crops of Schriver in 1919 were poor. It was necessary for him to become, if he continued farming, a large borrower. He was an extensive farmer. He enjoyed good credit at four different banks. Neither his ability as a farmer nor his credit as a customer has been questioned, except as the fatalities of nature have brought it into question. Heen was in full control of the bank. He enjoyed a wide discretion in making loans. He had been engaged for two seasons with Schriver in a joint venture. Through crop losses Schriver had become a debtor. He was unable to pay such indebtedness. It was necessary for him either to have credit or to quit farming operations. There was no concealment practised in the execution of the contract for the year 1920. It was witnessed by the assistant cashier, who simply explained that he paid no attention to its contents, and by a director of the bank who does not testify at all concerning his signature thereto. It was then recorded by Heen with the register of deeds. Pursuant to this contract, large amounts of hail insurance were placed. No concealment was practised. A joint note was given for hail insurance premium. A joint application was made for hail insurance and a policy issued to Heen and Schriver jointly. Loans in increasing amounts, pursuant to this contract, continued to be made. Security was taken upon these loans for the bank. The security upon the personal property may have been inadequate and quite insufficient. The security upon the crops was a question of promise; one for nature's fulfilment. In May, 1920, Heen borrowed $1,000 from

the bank and credited it to Schriver's account. It is difficult to assume no knowledge of this transaction when it appears that the assistant cashier kept the books and the board of directors, at their meetings, examined the assets and paper in the bank. When hail losses occurred they practically destroyed the 1920 crop. The proceeds of the insurance came in the bank. The record fails to show any concealment in regard to the disposition of such proceeds. It is true that Heen took credit and gave credit to Schriver for items amounting each to about $760. It is true that he otherwise received some $1,400 for his personal use. But no concealment was practised. He used such moneys in part to pay on notes he owed the bank. The balance, in excess of half the amount, to which Heen was entitled, was-either credited to Schriver, or charged against the Heen & Schriver account covering expenses of farming operations. These farming operations, for seed, grain, feed, hay, gas, and oil, etc., cost at least $4,700, for half of which Heen admitted his liability. No settlement ever took place between Heen and Schriver. Heen has frankly admitted a liability for half of the indebtedness. He has shown no disposition to avoid payment of such liability, or to secrete any assets of Schriver or any of the bank's moneys, or the proceeds thereof, so as to escape such liability.

No moneys of the bank were received by him. Whatever moneys Schriver received were expended in farming operations. If they were expended for Heen's benefit, he assumed, and was willing to assume, responsibility. He was given a large discretion in making loans; he possessed the right to loan to himself and such loans are not questioned.

In the fall of 1920 it is evident that the effect of the crop returns, available or promised, jeopardized the line of credit extended to Schriver. When explanations were requested from Heen by the directors and other officials of the bank, he readily gave the same and produced, without hesitation, the contract with Schriver. Even after the directors and the other banking officials had become fully cognizant of Heen's relations with Schriver, Heen, nevertheless, was continued in his office with the same control and discretion as he formerly had. The acts of the banking officials concerning these farming operations, after full knowledge of Heen's relations with Schriver, do not show anywhere an interpretation of criminal intent upon the acts of Heen.

It must be noted that in the fall of 1920 frequent meetings of the

directors were had. McClure and Baker were then active directors working in the bank. Although the report was made to the bonding company in January, 1921, Heen, nevertheless was re-employed at the annual meeting of the directors and continued in employment until about June 1st, 1921. Together with the directors he consulted with Schriver, attempting to adjust the loans. A new contract was made. Heen had authority to make this contract. It was recognized by the banking officials by taking new security, by not denying liability for the $950 loan made by Heen to Schriver, and by further loans thereafter made when Davis took control as cashier. Furthermore, the evidence discloses that the situation has improved although Schriver again suffered hail losses in 1921. The increased loans made to Schriver in 1921, even including the $950, is offset by hail insurance moneys paid or available; thereby, some reduction will be made on his present indebtedness. This may be further reduced when an accounting is had concerning his crops of 1921. Furthermore, the contract of 1920 may have afforded, in some respects, a protection to the bank and not a detriment; for in 1920, when extensive hail losses occurred, crop detriments were suffered and financial stringency ensued. The crop interest of Heen may have served as a protection to the bank, as against other creditors of Schriver interested in such crop, unless it be claimed, or the evidence should show, that Heen had intended to repudiate any liability for Schriver's indebtedness. On the contrary, the evidence shows admission of liability by Heen for part of Schriver's indebtedness in the farming operations and no concealment practised in connection with the collection of the insurance moneys.

Although it may not be said or be held that the business judgment or practices of Heen may be commended in thus permitting the large extension of credit to Schriver in 1920, nevertheless, the conclusion cannot be escaped that the directors and other officers of the bank both recognized and countenanced this extension and continuation of credit. During the time of the extension and continuation of such credit at least two directors and two officers of the bank, other than Heen, were actively engaged at work in the bank. It is quite evident that these banking officials jettisoned many business practices and much business judgment, consonant with good or conservative banking, in order to

save the Schriver cargo, and carry it into a port of financial safety. As the extension of credit mounted higher and higher, the fact of such extension of credit could not escape the attention and consideration of the banking officials. Some of them were actively engaged in the bank. No misappropriation of moneys loaned is shown. Every dollar was used for the purposes for which it was loaned. The evidence wholly fails to show any fraudulent intent or design either on the part of Heen or Schriver to misappropriate the money or defraud the bank. The fact that Heen was interested with Schriver in the farming operations does not per se show fraudulent intent. In the absence of such joint interest between Heen and Schriver, the extension of such credit to Schriver would not otherwise be justified. The bank books evidenced a relation between Heen and Schriver. The contract between them was filed in a public record. The banking officials, after full knowledge of all of the relations between Heen and Schriver, continued Heen's employment, recognized Heen's responsibility and interest, and acted thereupon. The presumption of no fraudulent intent appears in the record, as it apparently did to the banking officials, who, after full knowledge of the facts, continued Heen's employment and authority, and the extension of credit to Schriver.

If it be conceded that the evidence discloses the exercise of poor judgment against the best interests of the bank and in some transactions a lack of the best faith, nevertheless, we are convinced that there is a total failure to show any criminal intent or acts on the part of Heen sufficient to constitute embezzlement. See Ann. Cas. 1917C, 429, note; Farmers State Bank v. Title Guaranty & T. Co. 133 Mo. App. 705, 113 S. W. 1147. Judgment notwithstanding the verdict should be entered in favor of the defendant. The judgment is reversed and the action ordered dismissed with costs.


BIRDZELL, Ch. J., and ROBINSON, and CHRISTIANSON, JJ., concur.


GRACE, J. (specially concurring). I am of the opinion that the principal opinion is correct in its holding to the effect that defendant Heen was not an embezzler.